FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## FT. WAYNE DIVISION

13 SEP 24 AM 10: 52

ROBERT N. TRGOVICH
U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT
OF INDIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Civil Action No. **1:13CV277** |
| | : | JVB |
| ex rel **UNDER SEAL**, | : | |
| | : | |
| | : | |
| BRINGING THIS ACTION ON | : | |
| BEHALF OF THE | : | |
| UNITED STATES | : | Complaint **Filed** |
| OF AMERICA | : | **IN CAMERA** |
| | : | **SEALED**, Pursuant to 31 U.S.C. |
| Plaintiffs, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| vs. | : | **DO NOT PLACE IN PRESS BOX** |
| | : | |
| **UNDER SEAL**, | : | **DO NOT ENTER ON PACER** |
| | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FT. WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel*. | Case No. _____ |
| FRANK COYLE AND RANDY BRUCE, | Date Received: _____ |
| BRINGING THIS ACTION ON BEHALF OF THE UNITED STATES OF AMERICA | **COMPLAINT FILED IN CAMERA SEALED,** pursuant to 31 U.S.C. § 3730(b)(2) |
| C/O DAVID A. CAPP<br>U.S. Attorney<br>Northern District of Indiana<br>5400 Federal Plaza, Suite 1500<br>Hammond, IN 46320 | **DO NOT PLACE IN PRESS BOX**<br>**DO NOT ENTER IN PACER** |
| And | |
| C/O ERIC HOLDER<br>Attorney General of the United States<br>Department of Justice<br>10th & Constitution Aves. N.E<br>Washington, D.C. 20530 | _____<br>United States District Court Judge |
| Plaintiff and Relators, | |
| vs. | |
| PHYSICIANS HOSPITAL, LLC d/b/a RIVERCREST SPECIALTY HOSPITAL; FRANCISCAN PHYSICIANS HOSPITAL, LLC d/b/a FRANCISCAN HEALTHCARE-MUNSTER; ORTHOPAEDIC HOSPITAL AT PARKVIEW NORTH, LLC and DUPONT HOSPITAL, LLC . | |
| Defendants. | |

-1-

## COMPLAINT

Plaintiffs and *qui tam* relators Frank Coyle ("Coyle") and Randy Bruce ("Bruce") (collectively, "Relators") by and through their attorneys, for their Complaint against Physicians Hospital, LLC d/b/a RiverCrest Specialty Hospital; Franciscan Physicians Hospital, LLC d/b/a Franciscan Healthcare- Munster; Orthopaedic Hospital at Parkview North, LLC; Dupont Hospital, LLC (sometimes hereinafter referred to collectively as "the hospital defendants" or "hospital defendants") allege as follows:

## I.    INTRODUCTION

1.    This is a False Claims Act action to recover treble damages and civil penalties brought by Relators, individually, on behalf of the United States of America ("United States" or "Government"), arising from unlawful schemes, false and/or fraudulent statements, records and claims for reimbursement submitted to the Government under Medicare, Medicaid, TRICARE, Children's Health Insurance Program, the Federal Employees Health Benefits Program and other government-funded healthcare reimbursement programs (collectively, "Government Reimbursement Programs") made or caused to be made by the hospital defendants and/or their agents and employees in violation of the Federal False Claims Act, 31 U.S.C. § 3729 et seq. ("False Claims Act" or "FCA") and Section 1877 of the Social Security Act, 42 U.S.C. § 1395nn, also known as the physician self-referral law ("Stark Statute" or "Stark").

2.    As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), Relators have provided to the United States a statement of all material evidence and information related to the Complaint. This disclosure statement is supported by material evidence

known to Relators at the filing establishing the existence of the hospital defendants' false claims.

## II.     JURISDICTION AND VENUE

3.     This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730. Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

4.     This Court has personal jurisdiction over the defendant pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the defendants have at least minimum contacts with the United States. Moreover, the defendants can be found in, reside in or transact or have transacted business in the Northern District of Indiana.

5.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because defendants transact business in the District and at least some of the alleged acts arose in the District. Physicians Hospital, LLC d/b/a RiverCrest Specialty Hospital is a hospital that maintains offices and provides inpatient and outpatient medical services at its facilities in Mishawaka, Indiana. Franciscan Physicians Hospital, LLC d/b/a Franciscan Healthcare-Munster is a hospital that maintains offices and provides inpatient and outpatient medical services at its facilities in Munster, Indiana. Orthopaedic Hospital at Parkview North, LLC is a hospital that maintains offices and provides inpatient and outpatient medical services at its facilities in Fort Wayne, Indiana. Dupont Hospital, LLC is a hospital that maintains offices and provides inpatient and outpatient medical services at its facilities in Fort Wayne, Indiana.

-3-

6.     The aforementioned hospital defendants provide medical and healthcare services, including "designated health services" as that term is defined by the Stark Statute, to the public and beneficiaries under each of the Government Reimbursement Programs and the hospital defendants receive a substantial amount of governmental reimbursement for such services.

7.     The submission of claims by the hospital defendants to the Government Reimbursement Programs for payment or reimbursement includes a representation and certification that each individual defendant hospital will abide by, has abided by, will adhere to and has adhered to all the statutes, rules and regulations governing the Government Reimbursement Programs, including but not limited to, the Stark Statute.

8.     The acts and omissions attributed to the hospital defendants in this Complaint were taken by or the responsibility of the hospital defendants and their employees and/or agents acting within the scope of their employment and/or agency with the defendant hospitals.

9.     No allegation is made that the hospital defendants were acting in concert with one another in relation to the allegations made herein or that any engaged in concerted action with the others to violate federal law. The fact that multiple defendants are included in this complaint should not be construed as such.

10.    Relators have direct and independent knowledge of the information on which the allegations of this Complaint are based and have voluntarily provided the information to the Government before filing this action based on said information. Relators satisfy all of the jurisdictional requirements set forth under 31 U.S.C. § 3730(e) in that this Complaint (a) is not an action brought by a former or present member of the armed forces against a member of the armed forces arising out of such person's service in

-4-

the armed forces; (b) is not an against a Member of Congress, a member of the judiciary or senior executive branch official based on evidence or information known to the government when the action was brought; (c) is not based upon allegations or transactions which are the subject of a civil suit or administrative proceeding in which the Government is already a party; (d) is not based upon the public disclosure of "allegations or transactions" in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media  Further, the Relators are original sources of the information where, for purposes hereof, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under the FCA which is based on the information.

11.    Prior to the time of filing this Complaint, Relators have voluntarily provided the information on which the allegations are based to the Government.

12.    The amount in controversy in this action exceeds the sum or value of $75,000 exclusive of interest and cost.

**III.    PARTIES**

13.    Plaintiffs and Relators Coyle and Bruce are citizens and residents of the United States of America.  Relators are suing in the name of and on behalf of the United States of America.

14.    Plaintiff and Relator Coyle is a resident of The United States of America. From August 1998 until the present, Relator Coyle served as a senior executive of a national healthcare company and, during such time, has been a staunch supporter of physician-owned hospitals, was directly involved in the formation, operation and

regulatory compliance of ten (10) physician-owned hospitals during the course of his 24 year career as a healthcare transactional attorney and healthcare executive. His practical and professional experience provide a basis for his direct and independent knowledge regarding the regulation physician-owned hospitals and the "whole hospital" investment exception under the Stark Statute and how it relates to the hospital defendants herein.

15. Plaintiff and Relator Bruce is a resident of The United States of America. From October 2002 until the present time, Relator Bruce served as a senior executive of a national healthcare company and has broad regulatory expertise in relation to federal healthcare laws. Relator Bruce is an experienced adviser of hospital operations personnel about the Stark Statute, has been a staunch supporter of physician-owned hospitals since at least October 2002, was directly involved in the formation, operation and regulatory compliance of ten (10) physician-owned hospitals during the course of his 16 year career in healthcare. His practical and professional experience provide a basis for his direct and independent knowledge regarding the regulation of physician-owned hospitals and the "whole hospital" investment exception under the Stark Statute and how it relates to the Defendants herein.

16. Defendant Physicians Hospital, LLC d/b/a RiverCrest Specialty Hospital ("RiverCrest") is a hospital located at 1625 East Jefferson Boulevard, Mishawaka, Indiana. RiverCrest is owned, in whole or in part, by one or more physician owner or investor "referral source" (as that term is defined under the Stark Statute, 42 C.F.R. § 411.351).

17. RiverCrest has 30-staffed beds, a CMS Certification Number of 152026, a website address at http://physicianshospitalsystem.net and has total patient revenue of approximately $22,700,236. Included in this estimate of annual revenue, RiverCrest bills

approximately $17,724,014 in Medicare revenue and $0 in Medicaid revenue per year, based on RiverCrest's cost report period ending 10/31/11.

18. RiverCrest provides "designated health services" (sometimes referred to as "DHS") as that term is used and defined under the Stark Statute – including inpatient and outpatient hospital services – as a direct result of patient referrals made to RiverCrest by each of the referral source investors of RiverCrest.

19. RiverCrest is the recipient of millions of dollars of federal funds from the Government Reimbursement Programs for the furnishing of "designated health services" each year.

20. Franciscan Physicians Hospital, LLC d/b/a Franciscan Healthcare-Munster ("Franciscan") is a hospital located at 701 Superior Avenue, Munster, Indiana. Franciscan is owned, in whole or in part, by one or more physician owner or investor "referral source" (as that term is defined under the Stark Statute, 42 C.F.R. § 411.351).

21. Franciscan has 32-staffed beds, a CMS Certification Number of 150165, a website address at www.franciscanalliance.org/hospitals/munster/pages/default.aspx and has total patient revenue of approximately $80,237,232. Included in this estimate of annual revenue, Franciscan bills approximately $23,934,564 in Medicare revenue and $2,163,417 in Medicaid revenue per year, based on Franciscan's cost report period ending 12/31/11.

22. Franciscan provides "designated health services" (sometimes referred to as "DHS") as that term is used and defined under the Stark Statute – including inpatient and outpatient hospital services – as a direct result of patient referrals made to P Franciscan by each of the referral source investors of Franciscan.

23. Franciscan is the recipient of millions of dollars of federal funds from the

Government Reimbursement Programs for the furnishing of "designated health services" each year.

24.     Orthopaedic Hospital at Parkview North, LLC ("Parkview") is a hospital located at 11130 Circle Drive, Fort Wayne, Indiana.  Parkview is owned, in whole or in part, by one or more physician owner or investor "referral source" (as that term is defined under the Stark Statute, 42 C.F.R. § 411.351).

25.     Parkview has 37-staffed beds, a CMS Certification Number of 150167, a website address at http://www.parkview.com/en/locations/Parkview-Regional-Medical-Center/Pages/Specialty%20Centers.aspx and has total patient revenue of approximately $148,743,216.  Included in this estimate of annual revenue, Parkview bills approximately $41,921,506 in Medicare revenue and $8,033,682 in Medicaid revenue per year, based on Parkview's cost report period ending 12/31/11.

26.     Parkview provides "designated health services" (sometimes referred to as "DHS") as that term is used and defined under the Stark Statute – including inpatient and outpatient hospital services – as a direct result of patient referrals made to Parkview by each of the referral source investors of Parkview.

27.     Parkview is the recipient of millions of dollars of federal funds from the Government Reimbursement Programs for the furnishing of "designated health services" each year.

28.     Dupont Hospital, LLC ("Dupont") is a hospital located at 2520 East Dupont Road, Fort Wayne, Indiana.  Parkview is owned, in whole or in part, by one or more physician owner or investor "referral source" (as that term is defined under the Stark Statute, 42 C.F.R. § 411.351).

29.     Dupont has 131-staffed beds, a CMS Certification Number of 150150, a

website address at www.thedupontdifference.com and has total patient revenue of approximately $393,029,856. Included in this estimate of annual revenue, Dupont bills approximately $62,962,549 in Medicare and $42,212,492 in Medicaid revenue per year, based on Dupont's cost report period ending 3/31/12.

30.     Dupont provides "designated health services" (sometimes referred to as "DHS") as that term is used and defined under the Stark Statute – including inpatient and outpatient hospital services – as a direct result of patient referrals made to Dupont by each of the referral source investors of Dupont.

31.     Dupont is the recipient of millions of dollars of federal funds from the Government Reimbursement Programs for the furnishing of "designated health services" each year.

32.     The term "physician owner or investor" (as defined by Stark, 42 U.S.C. § 1395nn(h)(5)) means "a physician (or an immediate family member of such physician) with a direct or an indirect ownership or investment interest in the hospital." Relators have verified that each of the Defendant hospitals have physician owners or investors or had physician owners or investors for a portion of the time period September 23, 2011 to the present.

33.     The United States of America funds federal medical care reimbursement programs through the Department of Health and Human Services ("DHHS") and regulated by the Centers for Medicare and Medicaid Services ("CMS").

**IV.     BACKGROUND**

34.     A section of the Social Security Act, 42 U.S.C. § 1395nn, commonly known as the "Stark Statute," provides (i) that a physician who has (or who has an immediate family member who has) a financial relationship with an entity may not refer

Medicare beneficiaries to the entity for the furnishing of "designated health services" and (ii) that an entity may not submit claims to Medicare Part A or Part B (or any other individual or payor for, *e.g.*, copayments) for designated health services provided pursuant to a prohibited referral. 42 U.S.C. § 1395nn(a)(1).

35. The regulation implementing 42 U.S.C. § 1395nn requires that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

36. Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial or ownership relationship with a clinical lab provider. See Omnibus Budget Reconciliation Act of 1989, Pub. Law 101–239, § 6204.

37. In 1993, Congress amended the Stark Statute (Stark II) to cover referrals for ten additional designated health services. See Omnibus Budget Reconciliation Act of 1993, Pub. Law 103-66, § 13562, Social Security Act Amendments of 1994, Pub. Law 103-432, § 152.

38. The Stark Statute establishes that the providers may not submit claims for item or services referred by physicians who have improper financial relationships with the providers of the items or services. In enacting the statute, Congress found that improper financial or ownership relationships between physicians and entities to which they refer patients can compromise the physician's professional judgment as to whether an item or service is medically necessary, safe, effective and of good quality. Congress relied on various academic studies consistently showing that physicians who had financial or ownership relationships with medical service providers used more of those

-10-

providers' services than similarly situated physicians who did not have such relationships. The statute was designated specifically to reduce the loss suffered by the Medicare Program due to such increased questionable utilization of services.

39.     In pertinent part, the Stark Statute provides:

(a)     **Prohibition of certain referrals**

(1) In general [e]xcept as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2),then –

A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter; and

B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1) (emphasis added).

40.     To put it plainly, under Stark:

a.  A physician

b.  may not make a referral

c.  to an entity for the provision of a designated health service ("DHS") for which Medicare payment may be made  (and the entity may not present a claim for services provided as a result of such a referral)

d.  if the physician or an immediate family member has a financial

-11-

relationship with the entity

e. unless either the referral or the financial relationship is "excepted"
from the statute's coverage.

42 U.S.C. § 1395nn(a)(1).

41. Under Stark, the default position is a flat prohibition against physician referrals to a hospital for designed health services (or the hospital's billing related thereto) unless the parties first comply with a technical exception permitted by Stark.

42. The Stark Statute includes exceptions that, if their elements are met precisely, permit financially interested physicians to refer and permit entities to bill for services that they furnish pursuant to such referrals. The exception applicable to financial relationships involving physicians' ownership of hospitals is referred to as the "whole hospital" investment exception.

43. Under Stark, "designated health services" includes: clinical laboratory services; physical therapy services; occupational therapy services; outpatient speech-language pathology services; radiology services, including magnetic resonance imaging, computerized axial tomography scans, and ultrasound services; radiation therapy services and supplies; durable medical equipment and supplies; parenteral and enteral nutrients, equipment and supplies; prosthetics, orthotics and prosthetic devices and supplies; home health services; outpatient prescription drugs; – perhaps most relevant to the subject matter of this Complaint – inpatient and outpatient hospital services; and outpatient speech-language pathology services. 42 U.S.C. § 1395nn(h)(6) (emphasis added).

44. Under Stark, a "financial relationship" can occur through a direct or indirect ownership or investment interest or a direct or indirect compensation arrangement. 42 C.F.R. § 411.354(a).

-12-

45.     In the main, most of the healthcare industry's compliance focus under the Stark Statute relates to prohibited financial relationships, which is defined broadly to include any "compensation" paid directly or indirectly to a referring physician; however, the Stark Statute provides well-known exceptions allowing for hospitals and physicians to engage in specific transactions without triggering Stark's referral and billing prohibitions (so-called "exceptions").

46.     The exceptions to Stark's referral and billing prohibitions permit qualifying compensation arrangements between a hospital and referral source for such arrangements as: (a) rental of office space / rental of equipment, (b) bona fide employment relationships, (c) personal services agreements (e.g., Medical Directorships), (d) remuneration unrelated to the provision of designated health services, (e) physician recruitment, (f) isolated transactions, (g) certain group arrangements with a hospital, and (h) payments by a physician for items and services. See 42 U.S.C. § 1395nn(e)(1) – (e)(8).

47.     Each of these enumerated compensation arrangement exceptions under Stark has specific, technical requirements that must be met in order for the Stark referral and billing prohibitions not to apply to the hospital and physician.

48.     To be clear, Stark is a strict liability statute. Intent is not an element of compliance with respect to any exception under Stark.

49.     The necessity of meeting each of the requirements of the exceptions to the Stark Statute prohibitions and punitive nature of the federal Stark Statute cannot be overstated. If a hospital and physician fail to satisfy each and every element required under an applicable Stark exception, whether it related to a compensation arrangement or an ownership or investment relationship, then the physician may not make a referral to

-13-

the entity for the furnishing of "designated health services" for which payment otherwise may be made, and the entity may not present or cause to be presented a claim or bill to any individual, third party payor or other entity for "designated health services" furnished pursuant to a prohibited referral.

50.     Turning then to the Stark ownership and investment exception at issue in this Complaint, prior to March 23, 2010 the Stark Statute provided an exception allowing a physician referral source to have an ownership or investment interest in a hospital generally, provided that the ownership or investment interest was in the hospital as a whole (i.e, not an investment interest in a department of a hospital) and the referring physician was authorized to provide services therein (i.e., the physician had medical staff privileges at the hospital in which he or she holds an ownership or investment interest). This Stark exception is referred to as the "whole hospital" investment exception.

51.     The Medicare Modernization Act ("MMA") imposed a moratorium on the application of the "whole hospital" investment exception with respect to physician ownership of certain specialty hospitals. Specialty hospitals were defined as hospitals primarily or exclusively engaged in the care and treatment of (a) patients with cardiac conditions, (b) patients with orthopedic conditions, (c) patients undergoing surgical procedures, or (d) any other specialized category of services designated by the Secretary. The MMA statutory moratorium on specialty hospitals expired in June of 2005.

52.     The Affordable Care Act ("ACA"), was signed into law on March 23, 2010.

53.     Effective with the enactment of ACA on March 23, 2010, Congress eliminated the "whole hospital" investment exception under Stark by prohibiting the establishment of any new physician-owned hospitals that were not Medicare-certified by

-14-

December 31, 2010. Hospitals with a provider agreement prior to December 31, 2010, such as the hospital defendants, were granted "grandfather status" and allowed to continue to participate in Medicare if they met certain new additional criteria. ACA imposed significant expansion limitations and other requirements on physician-owned hospitals, including amending the grandfathered "whole hospital" investment exception to make it more onerous for "grandfathered" physician-owned hospitals after ACA went into effect.

54. Effective March 23, 2010, ACA amended the "whole hospital" investment exception to provide as follows:

> "(3) **Hospital ownership**
>
> In the case of designated health services provided by a hospital (other than a hospital described in paragraph (1)) if—
>
>> (A) the referring physician is authorized to perform services at the hospital;
>>
>> (B) effective for the 18-month period beginning on December 8, 2003, the hospital is not a specialty hospital (as defined in subsection (h)(7) of this section);
>>
>> (C) the ownership or investment interest is in the hospital itself (and not merely in a subdivision of the hospital); and
>>
>> (D) the hospital meets the requirements described in subsection (i)(1) not later than 18 months after March 23, 2010."

42 U.S.C. § 1395nn(d)(3)

55. Effective March 23, 2010, as part of ACA, Subsection (i)(1) – as referenced in Subsection (3)(D) above provides as follows:

"(i) **Requirements for hospitals to qualify for rural provider and hospital exception to ownership or investment prohibition**

(1) **Requirements described**

For purposes of subsection (d)(3)(D), the requirements described in this paragraph for a hospital are as follows:

(A) **Provider agreement**

The hospital had—

(i) physician ownership or investment on December 31, 2010; and

(ii) a provider agreement under section 1395cc of this title in effect on such date.

(B) **Limitation on expansion of facility capacity**

Except as provided in paragraph (3), the number of operating rooms, procedure rooms, and beds for which the hospital is licensed at any time on or after March 23, 2010, is no greater than the number of operating rooms, procedure rooms, and beds for which the hospital is licensed as of such date.

(C) **Preventing conflicts of interest**

(i) The hospital submits to the Secretary an annual report containing a detailed description of—

(I) the identity of each physician owner or investor and any other owners or investors of the hospital; and

(II) the nature and extent of all ownership and

-16-

investment interests in the hospital.

(ii) <u>The hospital has procedures in place to require that any referring physician owner or investor discloses to the patient being referred, by a time that permits the patient to make a meaningful decision regarding the receipt of care, as determined by the Secretary</u>—

(I) <u>the ownership or investment interest, as applicable, of such referring physician in the hospital; and</u>

(II) <u>if applicable, any such ownership or investment interest of the treating physician</u>.

(iii) The hospital does not condition any physician ownership or investment interests either directly or indirectly on the physician owner or investor making or influencing referrals to the hospital or otherwise generating business for the hospital.

(iv) <u>The hospital discloses the fact that the hospital is partially owned or invested in by physicians</u>—

(I) <u>on any public website for the hospital; and</u>

(II) <u>in any public advertising for the hospital</u>."

42 U.S.C. § 1395nn(i)(1) (emphasis added).

56.     By CMS rulemaking, the effective date of Subsection (i)(1)(C)(iv) had a delayed effective date and did not go into effect until 18 months after the effective date of ACA, which made the public disclosure requirements of Subsection (i)(1)(C)(iv) go into

effect on September 23, 2011.

57.    It is the Stark requirement under Subsection (i)(1)(C)(iv) that the Defendant hospitals have violated, the result of which has caused each of the Defendant hospitals individually to fail to meet the requirements of the Stark "whole hospital" investment exception, as amended by ACA, from September 23, 2011 to the present date.

58.    Congress's use of the word "any" in this statute makes this disclosure obligation exceptionally broad.    After September 23, 2011, each physician-owned hospital became obligated to disclose that fact that it is partially owned or invested in by physicians on ANY public website for the hospital AND in ANY public advertising for the hospital.  The defendant hospitals failure to include this disclosure for ANY period of time on ANY public website for the hospital or in ANY public advertising is an indisputable failure to comply with the applicable Stark exception related to physician-owned hospitals.

59.    The ownership disclosure rule is both a statutory requirement enacted by Congress (42 U.S.C. § 1395nn(i)(1)) and a regulatory requirement (42 C.F.R. §§ 411.356, 411.362) for physician-owned hospitals.  Both the statutory directive and regulatory requirement related to this ownership disclosure became effective September 23, 2011.

60.    42 U.S.C. § 1395nn(i)(5) defines "physician owner or investor" as a "physician (or an immediate family member of such physician) with a direct or an indirect ownership or investment interest in the hospital."

61.    The regulatory requirement under ACA that a physician-owned hospital must disclose the fact that the hospital is partially owned or invested in by physicians on any public website for the hospital and in any public advertising for the hospital became effective and legally enforceable on September 23, 2011 (i.e., eighteen months after

enactment of ACA).

62.    Prospectively, legal violation under Subsection (i)(1)(C)(iv) would cease beginning at the time that a physician-owned hospital began to make the required disclosure of physician ownership on its public website. Prospective disclosure would not, however, remedy any period of Stark noncompliance from September 23, 2011 -- or a later date if failure to comply occurred later -- through the date on which the physician-owned hospital's public website was updated to include the required disclosure notice.

63.    To underscore the enforcement position of CMS related to the public disclosure requirements under the "whole hospital" investment exception under Stark, as amended by ACA, in responses to public comments during the rulemaking period under ACA, CMS provided a number of pertinent comments to questions posed by members of the healthcare industry and physician-owned hospitals, including: "We received several comments on this proposal and have considered each comment as discussed below. Commenters in favor of our proposal agreed that the proposed procedures for assuring that patients are informed about hospital ownership interests of referring and treating physicians are adequate, reasonable, and not overly burdensome."   72247 Federal Register, Vol. 75, No. 226 (November 24, 2010).

64.    For additional legislative and administrative background, relevant CMS responses to public comments as part of CMS's rulemaking under ACA included the following:

> a.    Comment: One commenter believed that CMS should give further consideration as to how it can impose the disclosure requirements directly on the physician rather than the hospital. The commenter noted that the hospital, not the physician, is in a position to be sanctioned for a physician

owner's failure to disclose. Another commenter recommended that the loss of a physician's medical staff membership or admitting privileges was too draconian a remedy for the physician's failure to disclose his or her hospital ownership interests. One commenter recommended that if a physician does not disclose his or her ownership in a hospital at the time of referral, the physician should not receive Medicare payment for his or her professional services provided at the hospital. Response: *Section 1877(i)(1)(C)(ii) of the Act requires hospitals to have procedures in place to require a referring physician owner to disclose to the patient his or her ownership or investment interest in the hospital as well as any ownership interest, if applicable, of the treating physician*. Those procedures, in turn, must require physicians to agree to make such disclosures as a condition of continued medical staff membership or admitting privileges. A physician's failure to fully comply with such agreement is a disciplinary matter for the hospital to resolve in accordance with the medical staff bylaws and would not necessarily result in a violation of the physician self-referral law. As noted above, a similar requirement already appears in our provider agreement regulations at Sec. 489.20(u)(2). The last comment is beyond the scope of this rulemaking. 42 C.F.R. §§ 411.356, 411.362; 72247-72248 Federal Register, Vol. 75, No. 226 (November 24, 2010) (emphasis added).

b.      "Comment: Several commenters stated that the statutory provision at section 1877(i)(1)(C)(iv) of the Act requiring hospitals to disclose physician ownership information on the hospitals' Web sites could be

accomplished by placing such information on the home page or ''about us'' section on the Web sites. The commenters also believed that the disclosures on the Web sites should be clearly visible to the typical reader. Response: We agree with the recommendations made by the commenters. We believe a hospital could satisfy this requirement by including on one location within its public Web site a list of the physician owners who actively practice at the facility. A list of the physician owners should be located in a conspicuous place on the Web site, on a page that is commonly visited by current or potential patients, such as the home page or ''about us'' section. We also believe the physician ownership information should be readily legible and in a size that is consistent with other text on the Web site." 42 C.F.R. §§ 411.356, 411.362 72248; Federal Register, Vol. 75, No. 226 (November 24, 2010).

c.      "Comment: One commenter recommended that the hospital requirement to disclose hospital ownership information in any public advertising should be limited to specific activities and should not be required in all public advertising. The commenter suggested that the inclusion of physician ownership information in its public advertising should apply only to direct mail, Internet, and other print communications where such communication can be read and fully understood. The commenter believed that a hospital should not be required to include disclosures in other advertising, such as the kind found on billboards, or radio and television. Another commenter also recommended that hospital disclosures in public advertising should be confined to print media such as

newspapers, magazines, and other internally produced print material for public use. Response: *We have no flexibility regarding the disclosure of hospital ownership information*. Section 1877(i)(1)(C)(iv) of the Act requires that the hospital disclose the fact that the hospital is partially owned or invested in by physicians in "any public advertising" for the hospital. We believe that the disclosure can be satisfied by simply adding a sentence to this effect in public advertisements. We agree that a hospital also is required to disclose this information in a clear and readable manner in any of its print advertising made available to the public, such as direct mailings and other print communications, for example, newspapers and magazines." 42 C.F.R. §§ 411.356, 411.362; 72248 Federal Register, Vol. 75, No. 226 (Wednesday, November 24, 2010) (emphasis added).

65.     Violations of Stark subject the physician and the billing entity to exclusion from participation in federal health care programs and various financial penalties, including (a) a civil money penalty of $15,000 for each service included in a claim for which the entity knew or should have known the payment should not be made under section 1395nn(g)(1); and (b) an assessment of three times the amount claimed for a service rendered pursuant to a referral the entity knows or should have known was prohibited. See 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

66.     Under ACA, as enacted by Congress in March 2010, there is not a reduced penalty specific to the physician-owned disclosure requirements. Accordingly, the lack of a lesser penalty should heighten the concern of physician-owned hospitals, as the public disclosure requirements of ACA must be viewed as an element of the whole-hospital exception. If a physician-owned hospital has no website disclosure during a

period on or after September 23, 2011, the "whole hospital" investment exception's availability would not be available to the physician-owned hospital or its physician owners. If the exception was not available, the consequence is claims for payment to Medicare, Medicaid and other federal payors resulting from physician-owners' referrals for DHS during the period of non-compliance are false claims for payment and ineligible for reimbursement.

67.    Thus, Congress has set a strong policy that if physicians are allowed to have an ownership interest in a hospital to which they refer patients, and from which the hospital and physician receive federal revenue, the hospital must disclose the fact of physician ownership in all of its public advertising so that consumers are fully aware of the inherent conflict of interest.

## V.  **BILLING AND CLAIMS PROCESS**

68.    On discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays.  C.F.R. §§ 413.1, 41.60, 413.64.  Hospitals, including each of the hospital defendants, submit patient specific claims for interim reimbursement on a Form CMS-1450 also known as a UB-92 (hereinafter referred to as "CMS-1450/UB92").

69.    As a prerequisite to payment for Medicare, CMS requires hospitals, including each of the hospital defendants, to submit annually a Form CMS-2552, more commonly known as the hospital cost report.  Cost reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.  Each of the hospital defendants submitted annual cost reports to Medicare, Medicaid and other Federal payors.

-23-

70.     A hospital may not participate in the Medicare program unless it files an annual cost report. 42 U.S.C. 1395g, 42 C.F.R. § 413.20(b). Each year's cost report covers all of the interim requests for reimbursement, such as the CMS 1450/UB-92 form submitted by participating hospitals for claims. The purpose of the cost report is to allow a platform for all of the claims submitted during the year to be audited and examined.

71.     Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

72.     In September 1994, Medicare revised the certification provision of the Hospital Cost Report to state:

> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations. Form HCFA-2552-92

73.     In or about 1996, the Hospital Cost Report form was revised again to state:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine, and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil, and administrative action, fines and/or imprisonment may result.

74.     Today, and during the applicable time period, the actual certification language states:

> MISRPREPRESENTATION OR FALISIFICATION OF ANY INFORMATION CONTAINTED IN THIS COST REPORT MAY BE PUNISHABLE BY CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

-24-

CERTIFICATION BY OFFICER OR ADMINISTRATOR OF
PROVIDER(S)

I HEREBY CERTIFY that I have read the above certification statement
and that I have examined the accompanying electronically file or manually
submitted cost report and the Balance Sheet and Statement of Revenue
and Expenses prepared by {provider name(s) and number(s)} for the cost
report beginning [date] and ending [date] and that to the best of my
knowledge and belief, this report and statement are true, correct, complete
and prepared from the books and records of the provider in accordance
with the applicable instructions, except as noted. I further certify that I am
familiar with the laws and regulations regarding the provision of health
care services, and that the services identified in the cost report were
provided in compliance with such laws and regulations.

75.    The certification is followed by a line for the signature of the facility

officer, title and date.

76.    Once the Stark Statute became effective along with the ACA amendments

thereto, providers certified on the CMS 2552 that the services provided in the cost report

were billed in compliance with the Stark Statute.

77.    A hospital is required to disclose all known errors and omissions in its

claim for Medicare reimbursement (including its cost reports) to its federal fiscal

intermediary. 42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known

errors in cost reports.

Whoever .... having knowledge of the occurrence of any event affecting (A) his
initial or continued right to any such benefit or payment.... Conceals or fails to
disclose such event with an intent fraudulently to secure such benefit or payment
either in a greater amount or quantity than is due or when no such payment or
benefit is authorized... shall in the case of such a .... concealment or failure... be
guilty of a felony.

78.    Final Medicare hospital payment is conditioned upon the cost report

certification being submitted to a Medicare fiscal intermediary.

79.    Under Part B, the physician typically submits a bill using CMS-1500. On

the claim form, the physician certifies that the services were "medically indicated and

-25-

necessary to the health of the patient."

80.     In addition, each provider must sign an agreement as a condition of participation that agrees to comply with all Medicare requirements including the fraud and abuse provisions. A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicare patients. By submitting a claim to Medicare for reimbursement, the provider certifies that the submitted claim is eligible for Medicare reimbursement and that the provider is in compliance with all Medicare requirements.

81.     Compliance with the Stark Statute is also a condition for participation in the Medicaid, TRICARE/CHAMPUS and FEHB programs. Accordingly, claims for reimbursement for inpatient or outpatient services under these programs that were the result of referrals tainted by violations of Stark, are false claims and not entitled to reimbursement.

82.     To summarize, pursuant to the terms of the Medicare Cost Report and the Medicare Provider Agreement, each of the hospital defendants certified that claims submitted were eligible for Medicare and Medicaid payment and that the providers had complied with the statutes and regulations relating to Medicare and Medicaid.

83.     Claims that derive from referrals that violated the Stark statute were not eligible for reimbursement. Submission of such a claim for reimbursement constitutes a false claim under the Federal False Claims Act 31 U.S.C. § 3729.

84.     The hospital defendants knew that claims derived from referrals that violate the Stark Statute are not eligible for federal or state reimbursement.

85.     Each of the hospital defendants submitted cost reports and interim claims on forms CMS-2552 and CMS-1450/UB-92 during the years from the Stark ACA

Amendments applicability to the present. The claims contained false certifications because each of the hospital defendants knew they were in violation of the Stark Statute making the claims false claims for payment.

86. Each year from the implementation of the ACA amendments to Stark to the present, the United States made final payment upon each of the hospital defendants filing of an annual Medicare Cost Report.

87. Those cost reports and interim CMS-1450/UB-92s contained claims for payment for patients referred to the hospital for services by physicians with an ownership interest in the hospital defendants to which the doctors referred their patients that was in violation of the Stark Statute for the reasons set forth herein.

88. The United States would not pay claims presented by the hospital defendants for claims related to patient referrals from physicians with ownership interests in the hospital defendants to which they referred the patients, if the United States knew the hospital defendants were violating the Stark Statute because claims submitted in violation of Stark are not payable by the express language of the statute enacted by Congress.

## VI. ALLEGATIONS

89. This *qui tam* case is brought against each of the hospital defendants for their individual failure to comply with clear and unequivocal statutory requirements under Stark, specifically under the "whole hospital" investment exception as amended by ACA, resulting in the submission of false claims for payment to the United States in connection with Government Reimbursement Program reimbursement paid to the hospital defendants for "designated health services" furnished by the hospital defendants resulting from referrals made by each hospital defendant's physician-owners.

-27-

90.     Between September 23, 2011 through the present date, RiverCrest has failed to adequately disclose the fact that it is partially owned or invested in by physicians on the hospital's website and in at least one or more television advertisement for RiverCrest.

91.     Relators discovered that defendant RiverCrest's hospital website and at least one or more television advertisement failed to provide the required disclosure notifications about defendant RiverCrest's physician ownership or investment interest as statutorily required by 42 U.S.C. § 1395nn(i)(1)(C)(iv).

92.     RiverCrest produces, maintains, manages, publishes and monitors its public website and television advertisements and knows or should know that its website and one or more of its television advertisements fails to adequately disclose the fact that RiverCrest is partially owned or invested in by physicians.

93.     This failure to disclose physician ownership to adequately disclose its physician ownership on its public website in at least one or more television advertisements presents, in and of itself, a prima facie case of Stark noncompliance by RiverCrest with respect to 42 U.S.C. § 1395nn(i)(1)(C)(iv)(I) which, by itself, causes RiverCrest's ownership or investment relationship with each of its physician owners and investors to be illegal such that, since the date of noncompliance with Stark, no such physician was permitted to make a referral to RiverCrest for the furnishing of "designated health services" for which payment by a Government Reimbursement Program otherwise may be made, and RiverCrest was not legally permitted to present or cause to be presented a claim or bill to any individual, third party payor or other entity for "designated health services" furnished pursuant to such prohibited referrals.

94.     Between September 23, 2011 through July 1, 2013, Franciscan has failed

to disclose the fact that it is partially owned or invested in by physicians on its public website for Franciscan.

95.     Relators discovered that defendant Franciscan's website failed to provide the required disclosure notifications about defendant Franciscan's physician ownership or investment interest from as statutorily required by 42 U.S.C. § 1395nn(i)(1)(C)(iv).

96.     Franciscan produces, maintains, manages, publishes and monitors its public website and knows or should know that its public website fails to disclose the fact that Franciscan is partially owned or invested in by physicians.

97.     This failure to disclose physician ownership on its public website presents, in and of itself, a prima facie case of Stark noncompliance by Franciscan with respect to 42 U.S.C. § 1395nn(i)(1)(C)(iv)(I) which, by itself, causes Franciscan's ownership or investment relationship with each of its physician owners and investors to be illegal such that, since the date of noncompliance with Stark, no such physician was permitted to make a referral to Franciscan for the furnishing of "designated health services" for which payment by a Government Reimbursement Program otherwise may be made, and Franciscan was not legally permitted to present or cause to be presented a claim or bill to any individual, third party payor or other entity for "designated health services" furnished pursuant to such prohibited referrals.

98.     Between September 23, 2011 through July 1, 2013, Parkview has failed to disclose the fact that it is partially owned or invested in by physician's ownership on the hospital's website and in at least one or more television advertisement for Parkview.

99.     Relators discovered that defendant Parkview's website and at least one or more television advertisements failed to provide the required disclosure notifications about defendant Parkview's physician ownership or investment interest as statutorily

-29-

required by 42 U.S.C. § 1395nn(i)(1)(C)(iv).

100.    Parkview produces, maintains, manages, publishes and monitors the hospital's website and television advertisements and knows or should know that its public website and at least one or more television advertisement fails to disclose the fact that Parkview is partially owned or invested in by physicians.

101.    This failure to disclose physician ownership on the hospital's website and in at least one or more television advertisement presents, in and of itself, a prima facie case of Stark noncompliance by Parkview with respect to 42 U.S.C. § 1395nn(i)(1)(C)(iv)(I) which, by itself, causes Parkview's ownership or investment relationship with each of its physician owners and investors to be illegal such that, since the date of noncompliance with Stark, no such physician was permitted to make a referral to Parkview for the furnishing of "designated health services" for which payment by a Government Reimbursement Program otherwise may be made, and Parkview was not legally permitted to present or cause to be presented a claim or bill to any individual, third party payor or other entity for "designated health services" furnished pursuant to such prohibited referrals.

102.    Between September 23, 2011 through July 1, 2013, Dupont has failed to disclose the fact that it is partially owned or invested in by physicians in at least two or more television advertisements.

103.    Relators discovered that in at least two or more television advertisements defendant Dupont failed to provide the required disclosure notifications about defendant Dupont's physician ownership as statutorily required by 42 U.S.C. § 1395nn(i)(1)(C)(iv).

104.    Dupont produces, maintains, manages, publishes and monitors its television advertisements and knows or should know that at least two or more television

advertisements fails to disclose the fact that Dupont is partially owned or invested in by physicians.

105.    This failure to disclose physician ownership in at least two or more television advertisements presents, in and of itself, a prima facie case of Stark noncompliance by Dupont with respect to 42 U.S.C. § 1395nn(i)(1)(C)(iv)(II) which, by itself, causes Dupont's ownership or investment relationship with each of its physician owners and investors to be illegal such that, since the date of noncompliance with Stark, no such physician was permitted to make a referral to Dupont for the furnishing of "designated health services" for which payment by a Government Reimbursement Program otherwise may be made, and Dupont was not legally permitted to present or cause to be presented a claim or bill to any individual, third party payor or other entity for "designated health services" furnished pursuant to such prohibited referrals.

106.    Since September 23, 2011, each of the defendant hospitals have submitted false claims for reimbursement from Medicare, Medicaid and other federal healthcare programs because all claims for payment require a certification of compliance with federal law including the Stark Statute. The certification on claims for payment related to referrals from physician owners or investors are false claims for payment because they fail to comply with the Stark Statute and are ineligible for payment.

107.    Since September 23, 2011, the physician-owners of the hospital defendants, with whom the hospital defendants have maintained illegal financial relationships, have referred large volumes of patients, including Medicare, Medicaid and other beneficiaries of Government Reimbursement Programs to the hospital defendants in which they have an ownership interest in violation of federal law. Some of these physicians are individually responsible for referrals of significant portions of the

-31-

revenues and profitability of the hospital defendants in which they have an ownership interest.

108.    The damages to the United States resulting from prohibited referrals to each of the hospital defendants and prohibited billing for the furnishing of "designated health services" – including inpatient and outpatient hospital services – in response to those prohibited referrals is substantial.

109.    As detailed in this Complaint, physician-owned hospitals must comply with the whole hospital exception in order to submit claims to Medicare for reimbursement of services furnished pursuant to referrals of physician owners or investors.  The Stark Statute requires a recipient of amounts billed in violation of the prohibitions to refund those funds.  42 U.S.C. § 1395nn(g)(2).  Consequently, all Medicare Part A and Medicare Part B reimbursement received by the hospital defendant physician-owned hospitals that did not make the necessary disclosures for designated health services furnished pursuant to the referral of a physician-owner from September 23, 2011 through the end of the applicable period of disallowance are subject to repayment.

110.    The Stark Statute specifies that an entity that submits to Medicare a claim for a service that the entity knows or should know is for a service for which payment is not permitted under the Stark Statute is subject to a civil monetary penalty of either up to $15,000 for each such service or three times the amount claimed for each service.  The Secretary of the Department of Health and Human Services is also authorized to exclude the entity from federal health care programs, and to direct applicable State agencies to exclude the entity from participation in State health care programs.  See 42 U.S.C. § 1395nn(g)(3); 42 U.S.C. § 1320a-7a.

111.    The term "referral" is broadly defined by Stark.  A referral can be direct or

-32-

indirect, meaning that the physicians are considered to have made referrals if they caused, directed or controlled referrals made by others. 42 C.F.R. § 411.351. A referral can be in any form, including – but not limited to – any written, oral or electronic means of communication. A referral also can be made in a plan of care and does not require that physicians send patients to particular entities or indicate in a plan of care that "designated health services" should be performed by particular entities. 42 C.F.R. § 411.351.

112.     Although the term "referral" generally includes services performed by physician employees and group practice members, CMS has determined that the term "referral" or "referring physician" excludes services personally performed by the referring physician and referrals to a physician's wholly-owned professional corporation. 42 C.F.R. § 411.351. Examples of personally performed services at a hospital include the professional component of cardiac catheterization and lithotripsy. For the most part, these services are physician services, although, the professional component of a radiology services is deemed to be a "designated health service." Referrals still take place when physicians refer patients to other members of their group practices or to other entities for "designated health services", including technical components of radiology services or hospital services themselves.

113.     The definition of "referral" includes "designated health services" provided in accordance with a "consultation" with another physician, including "designated health services" performed or supervised by the consulting physician or any "designated health service" ordered by the consulting physician.     42 C.F.R. § 411.351.     Orders by consulting physicians are imputed to the physician requesting the consult.

114.     Radiologists, pathologists and radiation oncologists are subject to special rules. When radiologists, pathologists and radiation oncologists order "designated health

-33-

services" pursuant to a consultation requested by another physician, such orders are statutorily excluded from the definition of "referral." 42 C.F.R. § 411.351.

115.    CMS has, through regulations, described the outer boundaries of "periods of disallowance"—*i.e.*, periods during which hospitals and other entities that furnish designated health services are not permitted to seek Medicare reimbursement for services ordered by Stark-barred physicians. For noncompliance with nonfinancial terms of an exception (*i.e.*, for noncompliance that "is unrelated to compensation"), CMS has provided the period of disallowance begins at the time the requirements of the applicable exception are not satisfied and "ends no later than" the date on which all of the requirements of the exception are met. 42 C.F.R. § 411.353(c).

116.    For a physician-owned hospital that did not disclose physician ownership on its website or on advertising, the period of disallowance therefore would begin on September 23, 2011. For noncompliance resulting from the absence of disclosure on hospital websites, the period would end "not later than" the day on which the disclosure was added to the hospital's website. For noncompliance resulting from the absence of disclosure in other advertising media, the end date is somewhat less clear, because advertising can exist in the public sphere indefinitely once it is published and continues to this day.

117.    Due to the nature of each of the hospital defendants' non-compliance with the Stark "whole hospital" investment exception, as amended by ACA, the period(s) of disallowance related thereto, and the number of the hospital defendants' physician-owners, their areas of practice and the volume of prohibited referrals made by each such physician-owner of the hospital defendants during the period(s) of disallowance, as alleged in this Complaint, the amount of prohibited claims submitted by the defendant

-34-

hospitals and paid by a Government Reimbursement Program is estimated in excess of $73,000,000.

118.     Based on the allegations presented, all reimbursement paid by the Government to the hospital defendants resulting from referrals from the physician owners in the hospital defendants during the applicable period of Stark non-compliance is subject to a recoupment claim for treble damages and penalties under the False Claims Act.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)

120.     Relators hereby incorporate and re-allege all the preceding paragraphs as if set forth fully herein.

121.     Defendants by and through their agents, officers, and employees, knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

122.     The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial.  The United States is entitled to this sum as reimbursement for monies obtained by the Defendants for false claims submitted to the United States.

123.     The United States is entitled to three times the total damages sustained as a result of the Defendants' violations.

124.     The United States is entitled to a civil penalty of not less than $5,000.00 and not more than $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' false claims.

125.    Relators are entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1).

### COUNT II: VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)

126.    Relators hereby incorporate and hereby re-allege all of the preceding paragraphs as if fully set forth herein.

127.    Defendants by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

128.    The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by the Defendants for false claims submitted to the United States.

129.    The United States is entitled to three times the total of damages sustained as a result of the Defendants' violations of 31 U.S.C. § 3729(a)(1)(B).

130.    The United States is entitled to a civil penalty of not less than $5,000.00 and not more than $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' false claims.

131.    The Relators are entitled to reasonable attorney's fees and costs under 31 U.S.C. §3730(d)(1).

### COUNT III: VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(G)

132.    Relators hereby incorporate and re-allege all the preceding paragraphs as if set forth fully herein.

133.    Defendants, by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

134.    The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by the Defendants for money improperly withheld from the United States.

135.    The United States is entitled to three times the total damages sustained as a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(G).

136.    The United States is entitled to a civil penalty of not less than $5,000.00 and not more than $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 Note; Public Law 104-410) for each of Defendant's false claims.

137.    The Relators are entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1).

## PRAYER FOR RELIEF

WHEREFORE, Relator prays that this Court enter an order granting the following judgment and relief as to each individual hospital defendant:

(a)    Ordering each Defendant to pay the United States Government three times its actual damages resulting from the Defendants' violations of the False Claims Act;

-37-

(b)     Ordering each Defendant to pay the United States Government a civil penalty for each false claim as set forth in the False Claims Act;

(c)     Awarding Relators an amount the Court decides is reasonable for collecting the civil penalty and monetary damages by pursuing this matter, which award, by statute shall not be less than 15% nor more than 25% of the proceeds of this action or the settlement of any such claim, if the Government intervenes in the action and not less than 25% nor more than 30% if the Government declines to intervene in the action.

(d)     Ordering each of the Defendants to pay Relators' attorneys' fees and cost;

(e)     Granting such other relief as the Court may deem just and proper.


DATED this 24th day of September, 2013.

Respectfully submitted,

By: _____
ROBERT T. DASSOW (15145-64)
HOVDE DASSOW + DEETS, LLC
201 W. 103rd Street, Suite 500
Indianapolis, IN 46290
Tel: (317) 818-3100
Fax: (317) 818-3111

-38-

case 2:13-cv-00217-SVB-HBG SEALED Document 1 Filed 09/24/13 page 40 of 40

*Of Counsel:*

SCOTT A. POWELL (ASB-7523-L60S)
DON McKENNA  (ASB-6494-C66D)

**Attorneys for Relators**

**HARE, WYNN, NEWELL & NEWTON, LLP**
The Massey Bldg., Suite 800
2025 Third Avenue North
Birmingham, AL 35203
Tel: (205) 328-5330
Fax: (205) 324-2165


JOHN A. DAY (TN Bar No. 9416)
Attorney for Relators

LAW OFFICES OF JOHN DAY, P.C.
5141 Virginia Way, Suite 270
Brentwood, Tennessee 37027
Tel: 615-742-4880
Fax: 615-742-4881


Attorneys for Qui Tam Plaintiffs

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

1:13CV277 JVB

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
UNITED STATES ex rel UNDER SEAL

**DEFENDANTS**
UNDER SEAL

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Robert T. Dassow, Hovde Dassow & Deets, LLC
201 W. 103rd Street, Suite 500, Indianapolis, IN 46290; (317) 818-3100

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☒ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question *(U.S. Government Not a Party)*

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 367 Health Care/ | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine / ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| | ☐ 355 Motor Vehicle Product Liability / ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury / ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | / ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice / ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education / ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | / ☐ 550 Civil Rights | | | |
| | / ☐ 555 Prison Condition | | | |
| | / ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from Another District *(specify)* ☐ 6 Multidistrict Litigation

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. Section 3729 False Claims Act
Brief description of cause:

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY**
*(See instructions):*
JUDGE

DOCKET NUMBER *INN1003B09*

DATE
09/24/2013

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____